Kenneth Steely, Esq.
BLACKSTONE TRIAL LAW
1200 Corporate Drive, Suite 425
Birmingham, AL 35242
Telephone: (205) 482-5558
kenneth.steely@blackstonetrial.com
(Admitted Pro Hac Vice)

Christopher R. Jones, WSB# 7-4837
GORDON REES SCULLY MANSUKHANI, LLP
515 E. Ivinson, Suite 108
Laramie, WY 82070
Telephone: (307) 365-6741
Facsimile: (307) 222-7825
crjones@grsm.com
(Local Counsel)

Counsel for Defendant Dr. Jeffery Scott

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| CHRISTOPHER D. HARRELL, an individual,<br><br>Plaintiff,<br><br>v.<br><br>JEFFERY SCOTT, et al.,<br><br>Defendants | **Civil No. 2025-CV-086-KHR**<br><br>DECLARATION OF JEFFREY L. SCOTT, D.O. IN SUPPORT OF DEFENDANT JEFFREY SCOTT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S COMBINED MOTION FOR A RESTRAINING ORDER AND PERMANENT INJUNCTION (DOC. 28) AND MOTION FOR COURT ORDER FOR PRESERVATION OF EVIDENCE (DOC. 27) |

I, JEFFREY L. SCOTT, D.O., hereby declare that my testimony below is true and correct to the best of my knowledge and belief and is given under penalty of perjury, pursuant to 28 U.S.C. § 1746:

**BACKGROUND, QUALIFICATIONS, AND BASIS OF KNOWLEDGE**

1. I am a board-certified family physician with over twenty-five years of clinical experience, with particular emphasis on geriatrics and chronic disease management. In October 2024, I assumed the part-time role of Regional Medical Director for the State of Wyoming with NaphCare, Inc. (approximately twenty-six hours per week). From approximately November 2024 through July 2025, I additionally served as the on-site primary care provider at the Wyoming Medium Correctional Institution in Torrington, Wyoming, where I personally evaluated and treated Christopher D. Harrell ("Mr. Harrell"), the plaintiff in this action. Since July 2025, my role has been limited to regional oversight duties, including care coordination, consultation on complex cases, and quality-metric monitoring, performed largely on a remote basis. As of June 1, 2026, I no longer serve as Regional Medical Director for NaphCare, I do not maintain an office with NaphCare, I no longer provide any medical services for Mr. Harrell or any inmates house in the Wyoming Department of Corrections ("WDOC"), and I have no access to security cameras or video footage.

2. Except where I expressly state that a matter is based on my review of records maintained by NaphCare Wyoming LLC ("NaphCare") in the ordinary course of business, I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to them.

3. I submit this declaration in support of Defendant Jeffrey Scott's Response in Opposition to Plaintiff's Combined Motion for a Restraining Order and Permanent Injunction (the

"Injunction Motion", Doc. 28) and Plaintiff's Motion for Court Order for Preservation of Evidence (the "Preservation Motion", Doc. 27).

**MY PERSONAL, FIRSTHAND TREATMENT OF MR. HARRELL**

4. I first evaluated Mr. Harrell on November 14, 2024, for a chief complaint of chronic diarrhea of approximately four years' duration. I reviewed his prior work-up, which was negative to that point, and formed a working differential diagnosis of irritable bowel syndrome with diarrhea versus lymphocytic colitis. To rule out inflammatory bowel disease, I ordered an erythrocyte sedimentation rate, C-reactive protein, a repeat complete blood count, and stool studies for leukocytes, culture, and ova and parasites, and I recommended a pan-endoscopy (EGD and colonoscopy). Mr. Harrell was on a FODMAP diet at that time, ordered by a prior provider, and I continued it pending further work-up. I discussed this plan with Mr. Harrell, and he appeared to agree with it.

5. To investigate Mr. Harrell's medical complaints, stool specimens were collected on December 6, 2024. The samples returned normal enteric flora on culture, a negative result for ova and parasites, a normal qualitative fecal fat, a negative fecal lactoferrin, and a fecal calprotectin of 12.3 µg/g, within the normal reference range (<50.0 µg/g). On December 14, 2024, I documented that these diagnostics had been reviewed and that all results were negative, normal, or within acceptable parameters, i.e. no evidence of diarrhea. Mr. Harrell was notified of the results.

6. On December 4, 2024, Mr. Harrell provided a list, prepared in his own hand, of foods he reported tolerating and not tolerating. I also noted a significant amount of sugar, likely in the form of high-fructose corn syrup, in his commissary purchases. Because his self-reported symptom onset coincided with a course of NSAID use and a possible COVID-19 infection, both

of which are documented in the medical literature as potential causes of transient pancreatic insufficiency, I recommended a trial of Creon, a pancreatic enzyme supplement.

7. At a follow-up visit on December 6, 2024, I reviewed Mr. Harrell's commissary purchases with him, noted that several items were inconsistent with a FODMAP diet, and discussed the Creon trial. Mr. Harrell reported that he was "feeling great" and appeared receptive to the treatment plan.

8. Diet orders that I personally entered during this period continued Mr. Harrell's FODMAP diet, with orders on file from September 24, 2024 through January 29, 2025, and December 18, 2024 through January 29, 2025.

9. Between December 6, 2024 and January 8, 2025, I was informed by nursing staff that Mr. Harrell had not complied with the bowel preparation necessary for colonoscopy, resulting in cancellation of the procedure, and that he had discontinued Creon after fewer than ten days, which I considered an inadequate trial. I also reviewed his commissary purchases again and noted continued purchases of high-sugar items inconsistent with a FODMAP diet.

10. On January 8, 2025, I met with Mr. Harrell, with Dr. James Church also present, to discuss his ongoing frustrations with his care. I explained to him that a FODMAP diet is medically indicated as a short-term elimination diet, generally for two to six weeks, and that he had at that point been on the diet for approximately seven months or more. I explained that FODMAP is not itself a medical treatment, but a tool to help identify foods that may not be well tolerated. We discussed a treatment plan consisting of a four-week trial of Creon with re-evaluation, followed by a trial of oral budesonide for possible microscopic colitis if there was no improvement, and a referral to a gastroenterologist if budesonide likewise did not resolve his symptoms. Mr. Harrell

appeared to understand and agree with this plan, and he expressed no disagreement with it at the time.

11. Shortly after that same visit, Mr. Harrell submitted a Health Services Request stating: "After our discussion today with Dr.'s Scott and Church, being told that now the colonoscopy & endoscopy will not be happening until I wait thru 2 more months of pills, I feel like these tests are being delayed again to save money. I still do not have an answer to why this problem persists, I still want these 2 tests, I want an answer." I did not tell Mr. Harrell that he could not have those tests or that he did not need them; my clinical opinion, based on the work-up to that point, was that his existing findings made it unlikely that colonoscopy would yield information that would change the treatment plan already discussed with him.

12. On January 28, 2025, I performed a chart review in response to Mr. Harrell's report that Creon was not helping. I discontinued Creon and recommended a trial of budesonide, since his lab values did not suggest macroscopic colitis or inflammatory bowel disease, and I ordered additional stool studies to further evaluate his reported symptoms. At that time, the FODMAP diet had been in place, on my review, for approximately nine months without demonstrated benefit apart from Mr. Harrell's subjective reports, and his commissary purchases continued to include high-FODMAP items.

13. On January 29, 2025, based on (a) the medical literature indicating that a low-FODMAP diet is intended as a short-term elimination tool, generally two to six weeks in duration, and is not appropriate for indefinite use; (b) Mr. Harrell's own identification, in his own writing, of gluten as his primary problematic food; and (c) his continuing weight loss while on a prolonged restrictive diet, I ended the FODMAP diet order and placed Mr. Harrell on a gluten-free diet. This decision was based on these clinical considerations. It was not made in response to, or in retaliation

for, any grievance, complaint, or communication by Mr. Harrell, including any complaint regarding his medical care.

14. On February 26, 2025, I reviewed Mr. Harrell's chart in response to further complaints of weight loss and reported blood in his stool, and I ordered repeat sedimentation rate, C-reactive protein, complete blood count, and stool studies for blood. Mr. Harrell had declined the offered budesonide trial and was awaiting a gastroenterology appointment. I also ordered additional prealbumin and comprehensive metabolic panel testing to further evaluate his nutritional status.

15. On February 27, 2025, a multidisciplinary team meeting was held with medical and mental-health staff to address Mr. Harrell's care. Mental health staff indicated that Mr. Harrell had declined mental-health services on multiple prior occasions, and he was again offered those services.

16. Laboratory studies obtained March 3–5, 2025 showed a complete blood count, C-reactive protein, and sedimentation rate within normal limits; a prealbumin of 22.6 mg/dL (reference range 20.0–40.0 mg/dL, i.e., within normal limits); and a comprehensive metabolic panel with total protein of 6.7 g/dL and albumin of 4.6 g/dL, both within normal limits. These results did not demonstrate metabolic evidence of malnutrition.

17. On March 12, 2025, I attempted to meet with Mr. Harrell, with Dr. Church again present, to discuss his continued weight loss. Mr. Harrell stated that I was "trying to starve [him] to death." I told him this was not true. Before I could further explain the basis for his dietary orders, Mr. Harrell left the exam room.

18. On March 13, 2025, I obtained a corporate consultation for a second opinion on Mr. Harrell's management and treatment plan. The review noted that current labs were normal,

suggesting no malnutrition, and recommended continuing the planned gastroenterology consultation, continued anti-diarrheal management, and holding further imaging and consultations until after the gastroenterology visit.

19. On March 18, 2025, Mr. Harrell was evaluated by gastroenterology (McKenna Spillar, PA-C, under the supervision of Dr. Chad Cooper, a board-certified gastroenterologist), who recommended TSH and celiac serologies, pancreatic elastase testing, a biliary ultrasound, and EGD/colonoscopy, which was thereafter arranged with Dr. Zihni, a board-certified surgeon.

20. A celiac disease antibody evaluation obtained March 20, 2025, was negative, with all results in the normal, negative reference ranges.

21. On March 21, 2025, given Mr. Harrell’s continued weight loss and the absence of objective findings supporting continued dietary restriction, he was placed on a regular diet.

22. On March 26, 2025, Dr. Zihni evaluated Mr. Harrell and agreed to proceed with EGD/colonoscopy, noting that Mr. Harrell’s complaints “sound functional, including its responsiveness to the FODMAP diet.” Dr. Zihni stated that he was not opposed to prison physicians resuming the FODMAP diet given Mr. Harrell's reported weight loss and symptom improvement on that diet, but that he would defer that decision to the treating providers pending more objective data. Following that evaluation, and in consultation with Dr. Church, registered dietitian Nanette Meredith, and food services manager Edna Curry, a FODMAP diet order was entered effective March 26, 2025 through May 12, 2025, based on a food list Mr. Harrell provided.

23. Additional stool studies obtained March 31, 2025, were negative for C. difficile toxin and antigen and negative for fecal lactoferrin.

**SUBSEQUENT CARE BY OTHER PROVIDERS AND OBJECTIVE FINDINGS REVIEWED IN MY OVERSIGHT CAPACITY**

24. Following the events described above, my direct, in-person clinical involvement with Mr. Harrell ended. Day-to-day treatment responsibility transitioned to other on-site providers — first Dr. Church, then Dr. Bishop beginning in approximately May 2025 — and Mr. Harrell was later housed at a different facility under the care of Dr. Susanne Levene. I did not personally examine Mr. Harrell after approximately March 2025. The paragraphs that follow are based on my review, in my prior role as Regional Medical Director, of records maintained by NaphCare in the ordinary course of business, and not on my personal observation of the events described.

25. Records reflect that Mr. Harrell underwent panendoscopy on May 19, 2025, showing mild acute gastritis, for which sucralfate and omeprazole were prescribed.

26. Records reflect that on July 22, 2025, Dr. Bishop documented that repeat testing for gluten allergy and celiac disease remained negative, that no medical evidence supported Mr. Harrell's claimed food restrictions, and that Mr. Harrell's prior weight loss was attributed to his voluntarily reducing his food intake rather than to diarrhea or vomiting preventing him from eating. A three-month extension of dietary accommodation was offered as a compromise before a planned return to a regular diet.

27. Records reflect that Mr. Harrell underwent a follow-up EGD on August 21, 2025, showing normal tissue with biopsy findings of chronic mild gastritis, and a gastroenterology follow-up visit on October 15, 2025, at which the temporary nature of the FODMAP diet was again explained to Mr. Harrell and a gluten-free diet was recommended.

28. Records reflect that Dr. Levene entered a FODMAP diet order effective October 22, 2025, excluding soy, gluten, dairy, cauliflower, broccoli, beans, peas, onion and garlic, apple, dextrose, cabbage, honey, and high-fructose corn syrup, which remained in effect until February 5, 2026, when it was discontinued by providers at WSP.

29. Records reflect a provider note dated April 1, 2026 stating that the most recent stool sample was "too formed to analyze" and that Mr. Harrell had "no documented diarrhea despite his repeated claims that he does," with his weight recorded at 161 pounds at that time.

30. Records reflect an examination on May 4, 2026 addressing complaints of hemorrhoids and intermittent bleeding, at which a mass or polyp was observed and flexible sigmoidoscopy was recommended.

31. Records reflect that following an offsite colonoscopy and pathology review on or about June 1, 2026, rectal biopsy showed focal active colitis without chronicity, and the reviewing provider's note states that a FODMAP diet, or its discontinuation, does not cause focal active colitis or rectal nodules, and identifies the most likely diagnosis as lymphoid follicular hyperplasia or lymphoid follicular proctitis.

32. Records reflect a provider addendum dated June 8, 2026 explaining that a FODMAP diet is a symptom-management strategy and does not treat, prevent, or modify mucosal inflammation, lesions, or structural colon or rectal findings, and that reinstating the FODMAP diet would not be expected to resolve the findings described.

**CONCLUSION**

33. Throughout my personal treatment of Mr. Harrell, I ordered and reviewed laboratory testing, stool studies, and specialist referrals; adjusted his diet and medications in response to his reported symptoms and objective findings; obtained a corporate second opinion when his presentation and behavior complicated his care; and repeatedly offered mental-health services, which he consistently declined. At no time did I disregard a known, objectively serious medical need.

34. My decision to discontinue the FODMAP diet in January 2025 was based on accepted medical guidance regarding the short-term, diagnostic purpose of that diet, on Mr. Harrell's own identification of gluten as his primary problematic food, and on his continuing weight loss. It was not made in retaliation for any grievance, complaint, or protected communication by Mr. Harrell.

35. The subsequent medical record, developed by other providers after my direct involvement ended, independently confirms that a permanent low-FODMAP diet was not medically required: celiac serology and standard allergy testing have repeatedly been negative, gastroenterology specialists have recommended against indefinite FODMAP use, and the June 2026 endoscopic and pathology findings state that discontinuation of the FODMAP diet does not cause the mucosal or rectal findings at issue.

36. I have not served as Regional Medical Director for NaphCare since June 1, 2026, and I do not have current authority over Mr. Harrell's medical or dietary orders at his present facility.

37. Based on my personal knowledge of the care I provided and my review of the subsequent record, it is my professional opinion that the medical care provided to Mr. Harrell, including the decisions I made, was consistent with the applicable standard of care and was not the product of deliberate indifference or retaliatory motive.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 20th day of July, 2026.

Jeffrey L. Scott, D.O.

Jeffrey L. Scott, D.O.